UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

UNITED STATES OF AMERICA

    - against -

ISABELLA GARCIA,

              Defendant.

----------------------------------X

13 Cr. 154 (RWS)

SENTENCING OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FI
DOC #: _____
DATE FILED: 1/28/14

**Sweet, D.J.**

      On August 29, 2013, Isabella Garcia ("Garcia" or "Defendant") pleaded guilty to conspiracy to steal government funds pursuant to § 18 U.S.C. 371 and theft of government funds pursuant to § 18 U.S.C. 641.

      For the reasons set forth below, Garcia will be sentenced to time served followed by two years supervised release with a special condition of 6 months' home confinement. A fine of $3,000 and a special assessment of $200 are imposed.

Prior Proceedings

      Defendant was named in a Three-Count Indictment filed

1

in the Southern District of New York on March 6, 2013.   Count
One charges that from January 2011 through February 1, 2013, in
the Southern District of New York and elsewhere, Raymundo I.
Hernandez, Andrius E. Gonzalez Francisco, Jilfredo Gonzalez,
Dawin Brito, Isabel Garcia, Cristino Antonio Rodriguez and
others conspired to steal money from the United States Treasury
Department as they engaged in a scheme to obtain and cash
fraudulent income tax return checks.   Count Two charges that
from January 2011 through February 1, 2013, in the Southern
District of New York and elsewhere, Raymundo I. Hernandez,
Andrius E. Gonzalez Francisco, Jilfredo Gonzalez, Dawin Brito,
Isabel Garcia, and Cristino Antonio Rodriguez engaged in a
scheme to obtain and cash fraudulent income tax return checks.
Count Three charges that from at least January 2011 through
February 1, 2013, in the Southern District of New York and
elsewhere, Raymundo I. Hernandez, Andrius E. Gonzalez Francisco,
Jilfredo Gonzalez, Dawin Brito, Isabel Garcia, and Cristino
Antonio Rodriguez possessed and used the names and personal
identifying information of other persons during and in relation
to the offense charged in Count two of this indictment.

The Sentencing Framework

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

   (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2)   the need for the sentence imposed —

       (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       (B)   to afford adequate deterrence to criminal conduct;

       (C)   to protect the public from further crimes of the defendant; and

       (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   (3)   the kinds of sentences available;

   (4)   the kinds of sentence and the sentencing range established for —

       (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

   (5)   any pertinent policy statement . . . [issued

by the Sentencing Commission];

(6)    the  need  to  avoid  unwarranted  sentence
       disparities  among  defendants  with  similar
       records  who  have  been  found  guilty  of
       similar conduct; and

(7)    the need to provide restitution to any victims of
       the offense.

18 U.S.C. § 3553(a).   A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.   See

Crosby, 397 F.3d at 114-15.


The Defendant

          The   Court   adopts   the   facts   set   forth   in   the

Presentence   Investigation   Report   ("PSR")   with   respect   to

Defendant's personal and family history.


The Offense Conduct

          The  following  description  draws  from  the  PSR.   The

specific  facts  of  the  underlying  conduct  are  adopted  as  set

forth  in  that  document.    These  crimes  were  investigated  by  a

special agent employed by the Internal Revenue Service (Agent-1)

4

and a postal inspector employed by the U.S. Postal Inspection Service (the Case Inspector).

## *Tax Scheme Involving Puerto Rican Social Security Numbers and Electronic Filing Identification Numbers*

The following is a description of a scheme involving the fraudulent use of stolen Social Security numbers to submit false and fraudulent federal tax returns. Typically, the scheme worked as follows.

Participants in the scheme employed stolen Social Security numbers (SSNs) assigned to residents of Puerto Rico and filed fraudulent federal tax returns seeking tax refunds on behalf of those individuals. Residents of Puerto Rico often do not file tax returns with the Internal Revenue Service (IRS) because such filing is not required as long as all of the residents' income is derived from Puerto Rican sources. Thus, by using Puerto Rican SSNs, participants in the scheme, among other things, minimize the risks that a legitimate federal tax return already will have been filed by the person whose identity has been stolen. The fraudulently filed tax returns claim that the filer resides in one of the fifty states of the United States, for example, in New York State.

5

Participants in the scheme obtain the federal tax refund checks in various ways, including by causing them to be mailed by the United States Treasury to addresses to which the participants have access. Fraudulently obtained tax refund checks may be cashed with the assistance of either corrupt bank employees, corrupt check cashers, or individuals with business checking accounts who may not be required to have the payee named on the face of the check, a person normally in Puerto Rico, appear at the time that the check is cashed. In some instances, participants in the scheme cause tax refunds to be directly deposited into bank accounts controlled by them. All electronically filed tax returns are transmitted to the IRS through an Electronic Filing Identification Number (EFIN). EFINs are issued by the IRS to electronic return originators, such as online tax software providers (e.g., TurboTax, TaxSlayer), businesses (e.g., H&R Block), or individual tax preparers (e.g., accountants) to enable them to file tax returns with the IRS.

*The Defendant's Scheme*

According to information learned by the Case

6

Inspector, since approximately 2004, CC-1 has participated in a scheme which involved the filing of fraudulent income tax returns using the stolen identifying information of residents of Puerto Rico.  Among other things, CC-1 obtained EFINs from other co-conspirators and then used those EFINs to file fraudulent income tax returns after he had obtained stolen identifying information of residents of Puerto Rico that CC-1 had obtained from other co-conspirators.  CC-1 also sold these EFINs to other co-conspirators to enable them to also file fraudulent income tax returns using stolen identifying information of residents of Puerto Rico.  Further, CC-1 installed tax filing software on computers of other co-conspirators, taught co-conspirators how to use the tax software, and assisted them with setting up bank accounts to automatically have tax refunds electronically deposited into bank accounts.

At the time of CC-1's arrest, in plain view, the Case Inspector observed approximately 15 laptop computers in CC-1's home, as well as lists containing names, dates of birth, and Social Security numbers.  From further conversations with CC-1, the Case Inspector learned that through a network of individuals who know how to cash Treasury checks, CC-1 also had provided fraudulent Treasury refund checks to others to cash, for a

7

percentage of the face value of the check.

On February 4, 2013, voluntarily and at the direction of law enforcement, CC-1 placed multiple separate calls, which were recorded, to Raymundo I. Hernandez ("Hernandez"), Andrius E. Gonazlez Francisco ("Gonzalez Francisco"), and Jilfredo Gonzalez ("Gonzalez"). During those conversations, CC-1 informed Hernandez, Gonzalez Francisco and Gonzalez that, among other things, CC-1 had Treasury refund checks that had to be cashed. CC-1 arranged meetings with Hernandez, Gonzalez Francisco and Gonzalez.

On February 4, 2013, the Case Inspector observed Hernandez meet with CC-1, after he moved the meeting location with CC-1 because he did not like what he believed to be a police presence in the area. During that meeting, Hernandez agreed to use his contacts to cash the checks and took possession of approximately 80 United States Treasury checks and agreed to cash those checks for CC-1. Hernandez was arrested shortly thereafter, at approximately 8:30 p.m., after first fleeing from law enforcement.

On February 4, 2013, Gonzalez Francisco met with CC-1

8

at a pre-arranged location.   After a discussion of percentages,
Gonzalez Francisco took possession of approximately 50 United
States Treasury checks and agreed to cash those checks.
Gonzalez Francisco also specifically asked CC-1 whether the
checks were "white" or "yellow," referring to United States
Treasury checks sent via the United States mail or blank checks
printed using tax refund software. During that meeting, Gonzalez
Francisco contacted an unknown co-conspirator, confirming that
Gonzalez Francisco received "yellow" checks and asking about
percentages. Gonzalez Francisco was arrested shortly thereafter
at approximately 11:30 p.m.

On February 5, 2013, Jilfredo Gonzalez met with CC-1
at the prearranged location, along with Dawin Brito ("Brito").
Prior to arriving at the location, Gonzalez informed CC-1 that
he would accept whatever checks CC-1 had, and requested a
minimum of "150" which CC-1 understood to be 150 checks.   During
that meeting, CC-1, Gonzalez and Brito discussed, among other
things, that they were both partners in cashing checks. After a
discussion of percentages, CC-1 showed Gonzalez and Brito
envelopes containing United States Treasury refund checks.   CC-1
informed Gonzalez and Brito that one envelope contained 100
checks and another 50 checks, which Gonzalez and Brito both

9

agreed to cash. Gonzalez and Brito were arrested shortly thereafter at approximately 2:20 a.m.

On February 6, 2013, at the direction of law enforcement, CC-1 placed a call to a second co-conspirator ("CC-2") with whom CC-1 had previously worked to cash checks. During that conversation, CC-1 and CC-2 discussed, in code, that CC-1 had United States Treasury checks to be cashed. Thereafter, CC-2 informed CC-1 that he would be putting CC-1 in touch with others to cash those checks.

On February 6, 2013, a person later identified as Rodriguez called CC-1, but CC-1 missed the call. CC-1 thereafter returned the telephone call and, during that conversation Rodriguez informed CC-1 that CC-2 provided Rodriguez with CC-1's contact information and proceeded, in code, to discuss United States Treasury checks. During that conversation, Rodriguez asked what "color" CC-1 had. CC-1 thereafter arranged a meeting with Rodriguez.

On February 8, 2013, Isabel Garcia ("Garcia") called CC-1 and Garcia informed CC-1 that CC-2 provided Garcia with CC-1's contact information and proceeded to discuss the cashing of

10

United States Treasury checks. During that conversation, Garcia stated that an Arab cashed many checks previously but that she was currently using a Dominican check casher. CC-1 thereafter arranged a meeting with Garcia.

On February 10, 2013, Rodriguez met with CC-1 at a pre-arranged location. While at the meeting, and after a discussion of percentages, Rodriguez took possession of approximately 80 United States Treasury checks and agreed to cash those checks. Rodriguez was arrested shortly thereafter at approximately 4:20 p.m.

On February 10, 2013, Garcia met with CC-1 at a pre-arranged location. While at the meeting, Garcia requested "100" meaning $100,000 in United State Treasury checks. Garcia thereafter took possession of approximately 20 United States Treasury checks and agreed to cash those checks and also asked for copies of identifications that corresponded to those checks. Garcia was arrested shortly thereafter at approximately 7:15 p.m.

The Government's position is that Hernandez should be held accountable for between $400,000 and $1,000,000 in intended

11

loss.

Brito should be held accountable for between $1,000,000 and $2,500,000 in intended loss.

Gonzalez should be held accountable for between $1,000,000 and $2,500,000 in intended loss.

Rodriguez should be held accountable for between $400,000 and $1,000,000 in intended loss.

Francisco Gonzalez should be held accountable for between $200,000 and $400,000 in intended loss.

Garcia should be held accountable for between $120,000 and $200,000 in intended loss.

Garcia's criminal history is as follows:

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline |
| --- | --- | --- | --- |

| | | | |
|---|---|---|---|
| 6/16/94<br>Age: 29 | Possession of Forged Devices/ Middlesex County Superior Court, New Brunswick, NJ; Case# MID940801235I | 11/18/97: 28 days' jail time credit (non custodial confinement), 5 years' probation, 150 hours community service, assessed $125 | §4A1.2(e)(3) |
| 3/29/95<br>Age: 30 | Prostitution/ Collier County Court, Naples, FL; Case# 9502921MMA | 4/13/95: 6 months' probation, fined $200 | §4A1.2(c)(1) |
| 8/3/08<br>Age: 43 | Assault on Police and Resisting Arrest/ Somerset County Superior Court, Somerville, NJ; Case# SOM081000729I | 8/10/09: 90 days' imprisonment (suspended), 1 day served; 2 years' probation, 75 hours community service, assessed $280 | §4A1.1(c)<br>§4A1.2(e)(2) |

Garcia's other arrests include:

| Date of Arrest | Charge | Agency | Status |
|---|---|---|---|
| 2/25/92<br>Age: 27 | Cocaine Possession | Middlesex County Superior Court, New Brunswick, NJ; Case# MID920300138A | 3/3/93: Pre-Trial Intervention, 12 month driver program |

13

| 7/30/92<br>Age: 27 | Forgery | Lawrence Township Municipal Court, Lawrence Township, NJ; Case# W784206 | 6/13/96: Dismissed |
| 1/12/94<br>Age: 28 | Shoplifting | East Brunswick Township Municipal Court, East Brunswick, NJ; Case# W1234 | Disposition unavailable |
| 1/7/05<br>Age:40 | Receiving Stolen Property | New Brunswick Municipal Court, New Brunswick, NJ; Case#200500003012 14 | 3/21/05: Dismissed |

According to a letter from the Social Security Administration provided by Garcia, she receives $632 per month in disability benefits. The defendant reported that she owns an Acura automobile with mileage of 125,000 and a fair market value of $10,000. Defendant's total monthly income is $1,632, her total expenses are $1,230, and her net monthly cash flow is $402.00.

The Defendant reported that she has not filed income taxes in the past three years. An inquiry was made to the IRS to confirm this information. A response has not been received to date. An Equifax credit report dated October 22, 2012,

14

indicates that the defendant filed for chapter 7 bankruptcy in August 2004, and was discharged from some of her debt in November 2004.  Midland Funding LLC has a judgment against the defendant in the amount of $544.  Garcia has three accounts in collections with HSBC Bank, Public Service Electric and Gas (PSE&G), and Jeffers NCP in the amounts of $530, $1,365 and $368, respectively.  Additionally, the Defendant has two "charged off" credit accounts with First Premiere and Capital One in the amounts of $511 and $530, respectively.  Given the financial information reported above it appears that Garcia can pay a court sanction on an installment basis.


The Relevant Statutory Provisions


        The maximum term of imprisonment on Count One is five years imprisonment, pursuant to § 18 U.S.C. 371.  The maximum term of imprisonment for Count Two is ten years, pursuant to § 18 U.S.C. 641.  If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years per count, pursuant to § 18 U.S.C. 3583(b)(2).  The Defendant is eligible for not less than one nor more than five years' probation per count, pursuant to § 18 U.S.C. 3561(c)(1).

The maximum fine is the greatest of $250,000 or twice the gross gain/loss from the offense per count, pursuant to 18 U.S.C. 3571. A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to § 18 U.S.C. 3031.

As a result of committing the offenses alleged in Count 1 and 2 of the Information, Defendant shall forfeit to the U.S., pursuant to 18 USC 981(a)(1)(C) and 28 USC 2461, all property, real or personal, constituting or derived from proceeds traceable to the offense.

According to the Government, no forfeiture or restitution is due because the Defendants were arrested upon receiving the checks and thus, prior to cashing the checks.

**The Guidelines**

The November 1, 2012 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes pursuant to § 1B1.11(a). The Court finds the following with respect to the Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

16

Pursuant to Defendant's plea allocution, Defendant's base offense level is six. U.S.S.G. §2B1.1(a)(2). Pursuant to §2B1.1(b)(1)(F), an increase of ten levels is warranted because the intended loss was more than $120,000 but not more than $200,000. Assuming the Defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through her allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to §3E1.1(a). Furthermore, assuming the Defendant has accepted responsibility as described in the previous paragraph, an additional one-level reduction is warranted, pursuant to §3E1.1(b), because the Defendant will have given timely notice of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the foregoing calculations, the applicable offense level is 13. Based upon the calculations set forth above, the Defendant's stipulated Guidelines range is 12 to 18 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the Defendant's ability to pay,

17

the Court may impose a fine pursuant to §5E1.2.  At Guidelines
offense level 13, the applicable Guidelines fine range is $3,000
to $30,000.

      Garcia's Criminal History Category is I.

      The guideline range for a term of supervised release
is at least one year but not more than three years per count,
pursuant to §5D1.2(a)(2).  The Court shall order a term of
supervised release when required by statute (§5D1.1(a)(1)), or
except for a deportable alien who is likely to be deported after
imprisonment, when a term of imprisonment of more than one year
is imposed (§5D1.1(a)(2)).  Because the applicable guideline
range is in Zone D of the Sentencing Table, the defendant is not
eligible for probation, pursuant to §5B1.1.

## The Remaining Factors of 18 U.S.C. § 3553(a)

      Having engaged in the Guidelines analysis, this Court
also gives due consideration to the remaining factors identified
in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not
greater than necessary," as is required by the Supreme Court's
decision in Booker, 543 U.S. 220, and the Second Circuit's

18

decision in Crosby, 397 F.3d 103.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant."  Pursuant to 18 U.S.C. § 3553 (2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Given the Defendant's criminal history, the lack of victim impact, the fact that all co-conspirators were arrested before any losses were incurred, and the nature of the offense, the sentence imposed is appropriate.  Garcia has been under pretrial supervision since February 2013.  According to the defendant's pretrial services chronological record, she has been reporting as required and has been compliant while under pretrial supervision.  Defendant also has an outstanding warrant for removal pending according to ICE records.

**The Sentence**

For the instant offense, Defendant Garcia will be sentenced to time served followed by two years supervised

19

release with a special condition of 6 months' home confinement.

        The standard conditions of supervision (1-13), set
forth in the judgment, shall be imposed with the additional
special conditions:

        (1)    The defendant shall participate in a mental
health program approved by the U.S. Probation Office.  The
defendant shall continue to take any prescribed medications
unless otherwise instructed by the health care provider.  The
defendant shall contribute to the costs of services rendered not
covered by third-party payment, if the defendant has the ability
to pay.  The Court authorizes the release of available
psychological and psychiatric evaluations and reports to the
health care provider.

        (2)    The defendant shall comply with the conditions
of Location Monitoring for a period of six months, which program
may include electronic monitoring or voice identification.
During this time you will remain at your place of residence
except for employment and other activities, as approved by your
probation officer.  You will maintain a telephone at your place
of residence without call forwarding, a modem, caller ID, or

20

call waiting for the above period; portable cordless telephones are not permitted.  Location Monitoring shall commence on a date to be determined by the probation officer. Should a term of Location Monitoring be imposed, the defendant shall pay the costs of Location Monitoring on a self-payment or co-payment basis as directed by the probation officer.

(3)     The defendant shall obey the immigration laws and comply with the directives of immigration authorities.

(4)     The defendant shall submit her person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in reasonable manner.  Failure to submit to a search may be grounds for revocation.  The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

(5)  The defendant is to report to the nearest Probation Office within 72 hours of release from custody.

21

A fine of $2,000 is imposed.  The fine shall be paid in monthly installments of $150 over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for January 30, 2014.

It is so ordered.

New York, NY
January 27 , 2014

_____
ROBERT W. SWEET
U.S.D.J.

22